Richard A. Clark (State Bar No. 39558)
(rclark@pmcos.com)
Steven R. Platt (State Bar No. 245510)
(splatt@pmcos.com)
PARKER, MILLIKEN, CLARK, O'HARA
& SAMUELIAN. APC
555 S. Flower Street, 30th Floor
Los Angeles, CA 90071
Telephone: (213) 683-6500
Facsimile: (213) 683-6669

Robert E. Johnston (admitted *pro hac vice)*
(rjohnston@hollingsworthllp.com)
Stephen A. Klein (admitted *pro hac vice)*
(sklein@hollingsworthllp.com)
Andrew L. Reissaus (admitted *pro hac vice)*
(areissaus@hollingsworthllp.com)
HOLLINGSWORTH LLP
1350 I Street NW
Washington, DC 20005
Telephone: (202) 898-5800
Facsimile: (202) 682-1639

Attorneys for Defendant NOVARTIS
PHARMACEUTICALS CORPORATION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARLA LIEBLING,<br><br>            Plaintiff,<br><br>     v.<br><br>NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>            Defendant. | **Case No. 2:11-cv-10263-MMM-MRW**<br><br>**DECLARATION OF STEVEN R. PLATT IN SUPPORT OF DEFENDANT NOVARTIS PHARMACEUTICAL CORPORATION'S  OFFER OF PROOF RE EXPERT WITNESSES**<br><br>Pretrial Conference: July 21, 2014<br>Time: 9:00 a.m.<br>Judge: Hon. Margaret M. Morrow<br>Courtroom: 780 |

I , Steven R. Platt hereby declare:

1.     I am one of the attorneys for Defendant in the above-entitled matter.  I am over the age of 18, and competent to testify herein.  I make this declaration based on personal knowledge.

PARKER MILLIKEN
CLARK O'HARA &
SAMUELIAN, A
PROFESSIONAL
CORPORATION

- 1 -
DECLARATION ISO OFFER OF PROOF RE EXPERT WITNESSES

2. Attached hereto as exhibits in support of Novartis Pharmaceuticals Corporation's Offer of Proof Regarding Expert Witnesses are true and correct copies of the following:

- Exhibit 1: Excerpts of testimony given by Dr. Robert Marx from:
  - A: 4/30/2013 Trial Transcript, *Meng v. Novartis Pharmaceuticals Corp.*, MID-L-7670-07-MT, (Superior Ct. N.J, Middlesex County).
  - B: 8/13/13 Deposition Transcript, *Bard v. Novartis Pharmaceuticals Corp.*, NO. 3:07-CV-0837 (*In re Aredia and Zometa Products Liability Litigation*, MDL No. 1760 (M.D. Tenn.)).
  - C: 12/17/2012, Deposition Transcript, *Dore v. Novartis Pharmaceuticals Corp.*, NO. 2:06-CV-02271-ES-CLW (D.N.J.).
- Exhibit 2: Excerpts of testimony given by Dr. Susanne Parisian from:
  - A: 3/26/2014 Trial Transcript, *Dopson-Troutt v. Novartis Pharmaceuticals Corp.*, NO. 8:06-CV-1708-T-24EAJ, (M.D. Fla.).
  - B: 2/13/2010 Deposition Transcript, *Bessemer, etc. v. Novartis Pharmaceuticals Corp.*, NO. L-1835-08-MT (*In re Aredia and Zometa Products Liability Litigation*, MDL No. 1760 (M.D. Tenn.)).
  - C: 4/19/2013 Daubert Hearing Transcript, *Taylor v. Novartis Pharmaceuticals Corp.*, NO. 06-61337-CIV-COHN/SELTZER (M.D. Fla.).
  - D: 4/17/2009 Deposition Transcript, *In re Aredia and Zometa Products Liability Litigation*, MDL No. 1760 (M.D. Tenn.).

E:     5/1/2013 Trial Transcript, *Meng v. Novartis Pharmaceuticals Corp.*, NO: MID-L-7670-07-MT, (Superior Ct. N.J, Middlesex County).

- Exhibit 3:   Excerpts of testimony given by Dr. Eric Sung from:

A:     4/16/2013 Trial Transcript, *Georges v. Novartis Pharmaceuticals Corp.*, NO. 2:06-cv-5207-SJO-VBK, (C.D. Cal.).

B:     10/11/2011 Deposition Transcript, *Rhodes v. Novartis Pharmaceuticals Corp.*, NO: 3:06-CV-01168 (*In re Aredia and Zometa Products Liability Litigation*, MDL No. 1760 (M.D. Tenn.)).

C:     8/7/2013 Deposition Transcript, *Odia v. Novartis Pharmaceuticals Corp.*, NO: 3:12-CV-02089-BR (D. Or.).

D:     10/12/2011 Deposition Transcript, *Rhodes v. Novartis Pharmaceuticals Corp.*, NO: 3:06-CV-01168 (*In re Aredia and Zometa Products Liability Litigation*, MDL No. 1760 (M.D. Tenn.)).

E:     4/20/2011 Deposition Transcript, *Georges v. Novartis Pharmaceuticals Corp.*, NO. 2:06-cv-5207-SJO-VBK, (C.D. Cal.).

F:     1/29/2014 Deposition Transcript, *Liebling v. Novartis Pharmaceuticals Corp.*, NO. 2:11-cv-10263-MMM-MRW, (C.D. Cal.).

- Exhibit 4:   Excerpts of testimony given by Dr. James Vogel from:

A:     4/1/2014 Trial Transcript, *Dopson-Troutt v. Novartis Pharmaceuticals Corp.*, NO. 8:06-CV-1708-T-24EAJ, (M.D. Fla.).

PARKER MILLIKEN
CLARK O'HARA &
SAMUELIAN, A
PROFESSIONAL
CORPORATION

- 3 -

DECLARATION ISO OFFER OF PROOF RE EXPERT WITNESSES

B:      1/26/2012, Trial Transcript, *Brodie v. Novartis Pharmaceuticals Corp.* NO. 4:10CV0138-HEA (E.D. Mo.).

C:      4/2/2009 Deposition Transcript, *In re Aredia and Zometa Products Liability Litigation*, MDL No. 1760 (M.D. Tenn.).

D:      1/7/2010 Deposition Transcript, *Bessemer, etc. v. Novartis Pharmaceuticals Corp.*, NO. L-1835-08-MT (*In re Aredia and Zometa Products Liability Litigation*, MDL No. 1760 (M.D. Tenn.)).

E:      4/19/2013 Daubert Hearing Transcript, *Taylor v. Novartis Pharmaceuticals Corp.*, NO. 06-61337-CIV-COHN/SELTZER (M.D. Fla.).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on April 21, 2014, in Los Angeles, California.

                                      /s/ *Steven R. Platt*
                                     STEVEN R. PLATT

PARKER MILLIKEN
CLARK O'HARA &
SAMUELIAN, A
PROFESSIONAL
CORPORATION

- 4 -
DECLARATION ISO OFFER OF PROOF RE EXPERT WITNESSES

# Exhibit 1

EXHIBIT 1
5

# A

**EXHIBIT 1**

(MENG TRIAL) DAY 03 (Marx, Stewart)  4/30/2013  9:00:00 AM

A.  Yes, to lead to a discussion of them.

Yes.

Q.  And you also told them that periodontal disease, which is a disease of the gum, is a risk factor for osteonecrosis of the jaw?  Isn't that right?

A.  Yes, I discussed all of those as reported risk factors, like we had in the board yesterday.

Q.  Thank you.

Now, you talked yesterday about your own patients in your clinic in Florida.  Right?

A.  Yeah.

Q.  And you've said during your testimony thus far that you have -- you've seen a number of breast cancer patients at your clinic in Florida?

A.  Yes.

Q.  And you give -- you said that you give some credit to Zometa for extending their lives, haven't you?

A.  Yes.

Q.  And you think that Zometa should be given some credit for the fact that your patients, your cancer patients are still alive today.  Isn't that right?

Page 645

EXHIBIT 1
7

(MENG TRIAL) DAY 03 (Marx, Stewart)  4/30/2013  9:00:00 AM

A.   That is correct.

Q.   And you said that Zometa plays a key role in the management of cancer-related bone disease.  Isn't that true?

A.   Yes.

Q.   And you've written that Aredia and Zometa have extended the lives of many patients, haven't you?

A.   Yes.

Q.   And you've written that "the strategy of Aredia and Zometa and the design of Aredia and Zometa to inhibit osteoclasts from responding to the signals from cancer cells within bone is a very sound strategy."  Right?

A.   From a scientific perspective, yes. Within a dose limitation, yes.

Q.   Prior to Aredia and Zometa, cancer patients with bone metastasis suffered bone resorption that often led to severe disability. Right?

A.   Right.

Q.   And to death.

A.   Sometimes.

Q.   And you've said that it's not the cancer that resorbs bone that happens to patients with,

Page  646

**EXHIBIT 1**

**8**

(MENG TRIAL) DAY 03 (Marx, Stewart)  4/30/2013  9:00:00 AM

let's say, breast cancer that has metastasized to bone; it's not actually the cancer that's eating away at the bone, is it?  It's the cancer that stimulates osteoclasts to resorb the bone at a much higher pace than is in the normal case with a patient that does not have cancer.  Right?

A.    Right.

Q.    And then the cancer proliferates into the space, you've said, that's left behind when osteoclasts are stimulated by tumor cells create spaces that cancer tumors can proliferate into within bone.  Right?

A.    That's correct, yes.

Q.    And you've stated that cancer-induced resorption outpaces all attempts at new bone formation when cancer in the bone, in the case of a breast cancer patient, let's say, is present?

A.    Yes.  I wrote that.

Q.    And the cancer-induced resorption of bone increases the tumor load in your opinion.  Correct?

A.    Oh, yeah.

Q.    And the cancer-induced resorption of bone eventually leads to the death of the patient due to the loss of bone integrity, severe pain, fractures

Page 647

EXHIBIT 1
9

(MENG TRIAL) DAY 03 (Marx, Stewart)  4/30/2013  9:00:00 AM

and other things that can happen to them, like spinal compression, if that kind of bone metastasis is not controlled.  True?

A.   If it's not controlled by the chemotherapy and other treatments, yes.

Q.   Including Zometa.  Right?

A.   Zometa is one of them, yes.

Q.   And Zometa, you said, quote, "boxes in," unquote, the cancer and limits its growth.  Isn't that right?

A.   That's how it works, yes.  In bone.  Only in bone.

Q.   And you said that boxing in the cancer is an important goal for cancer patients?

A.   With metastasis to bone, yes.

Q.   And stopping cancer from invading into the bone is an extremely important goal for those patients.  Right?

A.   Yes, but I think that we need to clarify something.  There's no evidence that Zometa and Aredia prevent cancer from invading the bone.  Once it's actually in the bone, they prevent it from growing inside the bone, but they don't prevent it from getting into the bone in the first place.

Q.   Now, even if a patient has ONJ, you have

Page 648

**EXHIBIT 1**
**10**

(MENG TRIAL) DAY 03 (Marx, Stewart)  4/30/2013  9:00:00 AM

said that if Zometa is still benefitting the patient

from a cancer perspective, the medical oncologist

should continue on with Zometa treatment.  Isn't that

right?

A.   Yes.  That is correct.

Q.   And you said that because, although you

can control the ONJ, you can't control the runaway

cancer.  Isn't that right?

A.   Well, you can treat the ONJ.  The cancer

is more important, so yes.  The oncologist may

continue with whatever he feels is best for the

patient.

Q.   You can treat the ONJ, but it's a lot

more important to control runaway cancer is what

you've said.  Isn't that right, sir?

A.   Yes.

Q.   And, sir, from the very beginning of

your discussions in the literature in the medical

community, and within the medical community, I should

say, you have written that "ONJ will be painless or

only mildly painful."

Isn't that right?

A.   Unless it gets secondarily infected.

Q.   And you have explained that "the good

news is that exposed bone by itself is not painful."

Page  649

**EXHIBIT 1**

**11**

(MENG TRIAL) DAY 03 (Marx, Stewart)  4/30/2013  9:00:00 AM

Right?

A.    Not by itself.  Again, it's the secondary infection that causes the pain.

Q.    And you have stated that you can control the pain with simple antibiotics and an antiseptic mouthwash called Peridex.  Isn't that right?

A.    In many cases, you can.

Q.    And you have stated that "most people respond to that therapy and function normally." True?

A.    Well, they function with exposed dead bone in the mouth, but as normal as you could imagine with that, yes.

Q.    Well, you've said most people respond to that therapy and function normally.  Right?

A.    Yes.  But they still have exposed bone.

Q.    You say that "Very few patients with ONJ do not respond to antibiotics."  Correct?

A.    I said what?

Q.    You have said that "very few patients with ONJ do not respond to antibiotics."  In other words, there are only a few patients that don't respond favorably to antibiotics is what you have said.  True?

A.    Yes.  Many times you have to switch

Page  650

**EXHIBIT 1**
**12**

(MENG TRIAL) DAY 03 (Marx, Stewart) 4/30/2013 9:00:00 AM

antibiotics and you have to continue for a long time

and you get antibiotic complications, but you find a

regimen that patients can tolerate.

Q. Sir, you have said that, and you have published this, quote, "I believe the benefits of IV bisphonate therapy far outweighs the risk of developing bisphosphonate-induced exposed bone. Correct?

A. Yes.

Q. And you have said, quote, "bisphosphonate therapy far outweighs the risk of developing bisphosphonate-induced exposed bone, which remains very low among the 250,000-plus patients who receive these medications worldwide every year."

A. At the time I wrote that, that was true. Yes.

Q. And, sir, you wrote the following: "Aredia and Zometa have extended the survival and quality of life of those individuals with metastatic cancer deposits in their bone." True?

A. Yes, I wrote that.

Q. And you have written that, "Therefore, their efficacy," which means effectiveness, "outweighs the complications of osteonecrosis of the jaws." True?

Page 651

**EXHIBIT 1**

**13**

(MENG TRIAL) DAY 03 (Marx, Stewart)  4/30/2013  9:00:00 AM

A.    True.

MR. HOLLINGSWORTH:  No further questions, your Honor.

THE COURT:  Re direct?

MR. BEINS:  Your Honor, I'm going to have a good deal of redirect.  I'll leave it to the Court.

THE COURT:  I'll see you at side bar.

(Whereupon, there is a discussion off the record at side bar.)

THE COURT:  Members of the jury, this is an ideal time for your lunch.  I will give you one hour for lunch.  I ask that you report back in at 1:25, and then we'll bring you up at 1:30.

Thank you for your attention as always, please remember not to discuss the case and enjoy your lunch.

(Whereupon, a luncheon recess is taken.)

THE COURT:  Mr. Beins.

MR. BEINS:  Thank you, your Honor.

EXAMINATION BY MR. BEINS:

Q.    Dr. Marx, Mr. Hollingsworth asked you a number of questions, and I'm just going hit a couple of them in response.  But one of the areas I would like to talk about is something that you called the

Page 652

**EXHIBIT 1**

**14**

# B

EXHIBIT 1
15

Q. Now, you understand that her M.D. -- her physician at M.D. Anderson was an oncologist, a cancer doctor.  Right?

A. Yes, that was my understanding.

Q. You don't know the name of her cancer doctor at M.D. Anderson, do you?

A. No, and neither did she.  That's why I said "a physician" and didn't name one.  She did not recall that person either.

Q. And you don't know what went into the prescribing physician's calculus for determining to prescribe Aredia in 1999 instead of Fosamax.  True?

A. No, I do not know.

Q. And we talked about this in previous depositions numerous times, but you would defer to a oncologist as far as what kind of drugs they prescribed their cancer patients.  True?

A. Yes.  Just to elaborate on my previous answer. I said I found it curious.  I didn't disagree with it.

Q. Sure.

A. I didn't argue with it.  It's called off-label.  It is off-label, and I prescribe things off-label myself.

Q. Right.

A. So, it just was out of the ordinary, for lack

EXHIBIT 1
16

C

EXHIBIT 1

17

medications are oncologists or hematologists, correct?

A.  Oh, yes.  Yes, I would agree.

Q.  And that would be the target -- target audience for this drug, true?

A.  It would be the target user of that drug, yes.

Q.  Right.

A.  The ones that would use it in their practice.

Q.  That's a better way to put it.  Oncologists or hematologists would be the target users for denosumab, Aredia or Zometa, true?

A.  I'm going to correct you a little bit because, remember, denosumab is generic for two -- two medications, Prolia and Xgeva.  Xgeva it's true because Xgeva is at a certain dose that is FDA cleared for cancer patients except multiple myeloma.  Prolia is sort of the alternative to the oral bisphosphonates such as Fosamax, Actonel and Boniva.

Q.  Let's take Prolia off the table.

A.  Yeah, take Prolia off the table to mesh.

Q.  So let me repeat it so we're clear here.  The target -- the target users for denosumab, Zometa -- I'm sorry, for Xgeva, Aredia or Zometa are oncologists or hematologists that treat cancer, true?

A.  Yes.

Q.  And you've testified a number of times that

EXHIBIT 1
18

Marx, Robert E., DDS (Dore v NPC)  12/17/2012  12:00:00 PM

when it comes to the cancer treatment and medical regimens that those cancer doctors, oncologists and hematologists, decide to put their cancer patients on, you're going to defer to them as far as what drugs they need to take, true?

A. Yes, as I defer to their treatment.

Q. And you'll defer to them as far as what kind of dosing schedules that they need to be on for Aredia, Zometa or Xgeva, true?

A. For individual patients, yes.

Q. You don't treat cancer. I'm sorry. You don't treat metastatic cancer, you treat symptoms of oral cancer, correct?

A. Again, being picky, and I'm sorry to be so, I treat metastatic cancer when it involves the jaws and sometimes that's surgery, it's uncommon, but I do not treat what the medical oncologists treat. I work together with them in certain cases.

Q. And as far as the treatment of the underlying cancer, you'll defer to the oncologists and the hematologists, true?

A. Yes.

Q. Are you thinking about partnering up with any other coauthors on -- if you ever do write up that paper?

Page 45

**EXHIBIT 1**
**19**

# Exhibit 2

EXHIBIT 2

20

A

EXHIBIT 2

21

BY MR. VECCHIONE:

Q.  I UNDERSTAND, YOUR HONOR.  I JUST WANTED THE DATE AND WHAT THE EVENT WAS.

A.  OKAY.

Q.  YOU'LL MOVE ON IN THIS ONE.  YOU CAN PUT IT ASIDE.  ARE YOU FAMILIAR WITH THE DECEMBER 2003 MEETING IN SAN ANTONIO, TEXAS, IN CONNECTION WITH AREDIA AND ZOMETA?

A.  YES, SIR.

Q.  ARE YOU AWARE OF ANY RECOMMENDATION THAT CAME OUT?

A.  YES, SIR.

Q.  WITHOUT STATING WHAT THE RECOMMENDATIONS WERE, DO YOU HAVE AN OPINION ON WHETHER THE RECOMMENDATIONS WERE CARRIED OUT TIMELY UNDER THE COMPANY'S DUTY PHARMACOVIGILANCE?

A.  I DO HAVE AN OPINION.

Q.  WHAT IS IT?

A.  THAT THEY WEREN'T.

Q.  WE'VE HEARD THE TERM SAFE AND EFFECTIVE ABOUT FDA REGULATIONS.  CAN YOU EXPLAIN TO THE JURY WHAT SAFE AND EFFECTIVE MEANS IN CONNECTION WITH THE FDA ANALYSIS AND REGULATIONS?

A.  WELL, THERE IS DATA TO SUPPORT VALID SCIENTIFIC DATA THAT SOMETHING IS EFFECTIVE FOR A PARTICULAR INDICATION.  WE TALKED ABOUT INDICATION.  SAFETY IS HARDER BECAUSE SAFETY IS SOMETHING THAT YOU'RE GOING TO NEED A LOT MORE PATIENT EXPOSURE.  BUT SAFETY IN TERMS OF THE FDA APPROVAL MEANS THAT

Novartis - Zometa / Aredia                                      Page  165

EXHIBIT 2
22

(DOPSON_TROUTT TRIAL) Day 03 (Tang; Parisian; Maladorno)  3/26/2014  3:49:00 PM

THE COMPANY HAS MET THE MINIMUM AMOUNT OF SAFETY FOR A CLINICAL TRIAL TO GET APPROVED.  SO THE SAFETY INFORMATION IS GOING TO COME LATER.  CLINICAL TRIALS ARE NOT GOING TO DEVELOP THE SAFETY INFORMATION.  THEY'RE JUST NOT BIG ENOUGH. AND NO DRUG WOULD EVER GET APPROVED.  SO THE FDA'S BUZZ WORDS IS SOMETHING IS APPROVED IF IT'S SAFE AND EFFECTIVE WITH THE CAVEAT THERE IS LIMITED SAFETY AS TO WHEN YOU GET APPROVED.

Q.  ALL RIGHT.  NOW THE JURY ALREADY HEARD FROM DR. MALADORNO AND I'M GOING TO CALL UP PLAINTIFF'S EXHIBIT NO. 409.  ARE YOU FAMILIAR WITH THIS DOCUMENT?

A.  YES.

Q.  JUST REMIND THE JURY WHAT IT IS.  THEY CAN SEE IT.  IT'S IN EVIDENCE.

A.  IT'S BASICALLY THE COMPANY LOOKED AT ITS ARGUS DATABASE WHICH IS THEIR COMPLAINT DATABASE.

Q.  ALL RIGHT.  EXPLAIN TO THE JURY YOU USED TWO DATABASES. THIS IS RELATED TO -- ARE THE SAME AS THE AERS DATABASE?

A.  NO.

Q.  TELL THE JURY WHAT THE ARGUS DATABASE WAS.

A.  THAT'S THEIR INTERNAL COMPLAINT FILES.

Q.  ALL RIGHT.  AND IT'S IN EVIDENCE THAT -- I THINK WE SAW YESTERDAY THAT THE COMPANY SEARCHED THE ARGUS DATABASE OF ALL OF ITS ONCOLOGIC DRUGS FOR OSTEONECROSIS OF THE JAW?

A.  YES.

Q.  ALL RIGHT.  WHAT HAPPENED?

**Novartis - Zometa / Aredia**                                            **Page  166**

**EXHIBIT 2**
**23**

(DOPSON_TROUTT TRIAL) Day 03 (Tang; Parisian; Maladorno)  3/26/2014  3:49:00 PM

A.   YES, I DO HAVE AN OPINION.

Q.   WHAT IS IT?

A.   THAT IT DIDN'T.

Q.   THANK YOU, DOCTOR.  I HAVE NO FURTHER QUESTIONS.

      THE COURT:  ALL RIGHT.  MR. GRIFFIS.

      MR. GRIFFIS:  THANK YOU, YOUR HONOR.  I HAVE A

BINDER FOR DR. PARISIAN AND THE COURT.

      THE COURT:  I THINK I MAY I HAVE YOUR BINDER

ALREADY.

      MR. GRIFFIS:  THEY ARE ALL BLUE.  DOES IT SAY

SUZANNE PARISIAN ON IT?  OKAY.

                CROSS EXAMINATION

BY MR. GRIFFIS:

Q.   DR. PARISIAN, GOOD AFTERNOON.

A.   GOOD AFTERNOON.

Q.   YOU DON'T SPEAK FOR THE FDA, CORRECT?

A.   THAT'S CORRECT.

Q.   THE FDA APPROVED AREDIA FOR PATIENTS WITH BREAST CANCER THAT HAD SPREAD TO THEIR BONES, IN 1996, RIGHT?

A.   YES, SIR.

Q.   AND WHEN THE FDA APPROVED AREDIA FOR PATIENTS WITH BREAST CANCER THAT SPREAD TO THEIR BONES, THEY FOUND THAT IT WAS SAFE AND EFFECTIVE FOR THAT PURPOSE, CORRECT?

A.   FOR THAT INDICATION, YES, SIR.

Q.   AND THERE'S SOMETHING CALLED A PRESCRIBING INFORMATION,

Novartis - Zometa / Aredia                                                    Page  185

**EXHIBIT 2**
**24**

(DOPSON_TROUTT TRIAL) Day 03 (Tang; Parisian; Maladorno)  3/26/2014  3:49:00 PM

RIGHT?

A.  YES, SIR.

Q.  YOU'VE BEEN USING SOME OTHER TERMINOLOGY TODAY LIKE LABEL, PACKAGE INSERT, IT'S ALSO CALLED A PRESCRIBING INFORMATION?

A.  YES, SIR.

Q.  IT COMES IN FULL SIZE FORMATS.  IT CAN BE FOUND BY DOCTORS ON-LINE, AND BECAUSE THE FDA REQUIRES IT TO APPEAR IN EVERY VIAL OR EVERY BOX OF DRUG, IT ALSO COMES IN A FOLDED UP VERSION, IS THAT RIGHT?

A.  YES, SIR.

Q.  AND WHEN THE FDA APPROVED AREDIA FOR PATIENTS WITH BREAST CANCER THAT IT HAD SPREAD TO THEIR BONES, IN 1996, IT ALSO APPROVED THE PRESCRIBING INFORMATION THAT EXISTED AT THAT TIME, CORRECT?

A.  YES, SIR.

Q.  NOW, THE FDA APPROVED ZOMETA FOR PATIENTS WITH BREAST CANCER THAT SPREAD TO THEIR BONES, IN 2002?

A.  YES, SIR.

Q.  AND AGAIN, IT FOUND THAT ZOMETA WAS SAFE AND EFFECTIVE FOR THAT INDICATION?

A.  YES, SIR.

Q.  IT APPROVED THE PRESCRIBING INFORMATION?

A.  YES, SIR.

Q.  AND THAT THAT PRESCRIBING INFORMATION WAS DATED

**Novartis - Zometa / Aredia**                                                    **Page  186**

**EXHIBIT 2**
**25**

(DOPSON_TROUTT TRIAL) Day 03 (Tang; Parisian; Maladorno)  3/26/2014  3:49:00 PM

NECESSARILY PIVOTAL, BUT THEY ARE IMPORTANT, BUT THEY ARE

WHAT THE COMPANY WANTS THE FDA TO FOCUS ON FOR ODAC.

Q.   THIS IS THE ONE THE FDA FOCUSED ON TO DECIDE WHETHER IT MET THE REQUIREMENTS, SAFETY, EFFICACY, IS THAT RIGHT?

A.   RIGHT.  IT HIT ITS END POINT.

Q.   I JUST -- EFFICACY, THAT MEANS THE DRUG WORKS, RIGHT?

A.   FOR SRE, YES, SIR.  AS IT STATES.

Q.   THE QUESTION WAS, THIS WAS A QUESTION THAT WAS POSED TO THE ODAC COMMITTEE, THE 11 INDEPENDENT SCIENTISTS.  "IS THERE SUBSTANTIAL EVIDENCE ADEQUATE AND WELL CONTROLLED INVESTIGATIONS OF ZOMETA, FOUR MILLIGRAMS, EFFICACY FOR BREAST CANCER IN MYELOMA," CORRECT?

A.   YES, SIR.

Q.   AND THE VOTE WAS?

A.   11 YES, THAT THEY WANTED TO APPROVE IT.

Q.   IT WAS A UNANIMOUS VOTE?

A.   YES, SIR.

Q.   AND AFTER ODAC VOTED UNANIMOUSLY, ZOMETA WAS EFFECTIVE, FOUR MILLIGRAMS, FOR PATIENTS WITH BREAST CANCER, THE FDA APPROVED IT AS SAFE AND EFFECTIVE?

A.   YES, SIR.

Q.   AND WHAT ODAC RECOMMENDED THAT ZOMETA BE APPROVED FOR BREAST CANCER PATIENTS AND THE FDA APPROVED IT, IT WAS FOUR MILLIGRAMS EVERY 3 TO 4 WEEKS.  THAT IS THE DOSING APPROVED, RIGHT?

Novartis - Zometa / Aredia

EXHIBIT 2
26

(DOPSON_TROUTT TRIAL) Day 03 (Tang; Parisian; Maladorno) 3/26/2014 3:49:00 PM

A. YES, SIR. I DON'T THINK A LENGTH OF TIME, BUT YES, SIR.

Q. AND ONCE IT WAS APPROVED FOR FOUR MILLIGRAMS EVERY -- GIVEN EVERY 3 TO 4 WEEKS, THAT'S THE INTERVAL, EVERY 3 TO 4 WEEKS, NOVARTIS COULDN'T CHANGE IT TO TALK ABOUT A HIGHER OR LOWER DOSE, OR A LONGER OR A SHORTER DURATION OF TREATMENT WITHOUT GETTING FDA APPROVAL, RIGHT?

A. IT DEPENDED.

Q. YOU'VE TESTIFIED IN THE PAST THAT IF NOVARTIS WANTED TO MAKE A CHANGE, WANTED TO TALK ABOUT A HIGHER OR LOWER DOSE, OR LONGER OR SHORTER DURATION, IT WOULD NEED FDA APPROVAL FOR THAT, RIGHT?

A. YES, SIR.

Q. TO GET FDA APPROVAL, TALKING A HIGHER OR LOWER DOSE, OR LONGER/SHORTER DURATION NOVARTIS WOULD HAVE TO COME IN WITH DATA TO SUPPORT THAT, RIGHT?

A. YES, SIR.

Q. YOU TALKED ABOUT AN ANIMAL STUDY IN RICE RATS, EARLIER.

A. YES, SIR.

Q. AND YOU CAN'T IDENTIFY A SINGLE SCIENTIST ANYWHERE IN THE WORLD WHO DREW THE CONCLUSION, PRIOR TO 2003, THAT THAT RICE RAT STUDY SUGGESTED THAT BISPHOSPHONATES COULD CAUSE ONJ, RIGHT?

A. THAT'S CORRECT.

Q. YOU TALKED ABOUT THE GENETIC CONDITION OF OSTEOPOROSIS, RIGHT?

Novartis - Zometa / Aredia                                                  Page 193

EXHIBIT 2
27

(DOPSON_TROUTT TRIAL) Day 03 (Tang; Parisian; Maladorno)  3/26/2014  3:49:00 PM

BY MR. VECCHIONE:

Q. DR. PARISIAN, THERE WAS ONE QUESTION ABOUT DOSING. DID THE FDA EVER, DURING THIS PERIOD 1999 TO 2005, REQUEST ANY STUDIES AS TO THE DURATION OF TIME TO PRESCRIBE AREDIA OR ZOMETA?

A. YES.

Q. WHAT OCCURRED?

A. THEY DIDN'T -- THE DATA DIDN'T SUPPORT A DOSING PERIOD OF TIME.

Q. LET'S GO BACK A SECOND. I'D LIKE YOU TO LOOK AT THE LABEL FROM 20 -- SEPTEMBER 2003, PLAINTIFF'S EXHIBIT 2000F. DO YOU HAVE IT?

A. YES, SIR.

Q. DOES THIS LABEL HAVE ANY INFORMATION IN IT ABOUT HOW LONG AREDIA OR ZOMETA IS EFFICACIOUS?

A. IT'S UNKNOWN.

Q. ALL RIGHT. AND DOES -- CAN YOU SAY WHETHER OR NOT THE FDA THEN ASKED NOVARTIS TO DO FURTHER INQUIRIES INTO THAT?

A. YES.

Q. AND DID THEY?

A. YES.

Q. DID THEY PROVIDE THAT INFORMATION TO THE FDA?

A. THEY DID.

Q. AND WHAT WAS THE RESULT OF THAT AS FAR AS THE LABELS THAT THE JURY WILL HAVE IN FRONT OF THEM?

Novartis - Zometa / Aredia                                        Page  202

**EXHIBIT 2**
28

(DOPSON_TROUTT TRIAL) Day 03 (Tang; Parisian; Maladorno)  3/26/2014  3:49:00 PM

A.   THEY STILL DON'T KNOW.  THEY TALK ABOUT THE LAST TIME -- HOW LONG IT'S BEEN USED IN THE CLINICAL TRIALS, BUT THE LENGTH OF TIME THAT IT'S SUPPOSED TO BE GIVEN IT'S NOT KNOWN. THEY PROVIDE THE INFORMATION AS IS TO WHAT THE CLINICAL TRIALS HAVE DONE UP TO THAT POINT IN TIME.

Q.   AND CAN YOU LOOK TO THE MARCH 2004 LABEL, PLAINTIFF'S EXHIBIT 2000G.

A.   YES, SIR.

Q.   AND CAN YOU FIND THE SECTION WHERE THAT IS STATED?  AND IF YOU WANT TO LOOK AT A LABEL IN MARCH 2004 OR LATER, THAT IS FINE AS WELL.

A.   IT IS ALWAYS HARD TO FIND.

Q.   THAT'S FINE, DOCTOR.  I DON'T WANT TO TAKE UP THE JURY'S TIME.  BUT SUFFICE IT TO SAY AT SOME POINT DID THE FDA REQUIRE OR ASK NOVARTIS TO PUT EXTENSION STUDY INFORMATION ON THE LABEL?

A.   YES.

Q.   ALL RIGHT.  AND WHAT WAS THE CONTENT, IN GENERAL, OF THAT INFORMATION?

A.   HOW LONG TO USE IT.  BECAUSE THE ORIGINAL STUDIES HAVE BEEN SHORT TERM, LESS THAN 12 WEEKS.  SO THEY WANTED TO KNOW HOW LONG, AND IT'S NEVER BEEN IDENTIFIED HOW LONG IT SHOULD BE GIVEN SO THEY PROVIDED THE INFORMATION THAT WAS IN THE CLINICAL TRIALS, WHICH WAS SHORT-TERM DATA, I THINK NOTHING LONGER THAN TWO YEARS.

Novartis - Zometa / Aredia                                                              Page  203

EXHIBIT 2
29

# B

EXHIBIT 2
30

SUZANNE PARISIAN, M.D.

SUBMIT DETAILED INFORMATION TO THE FDA SO THE

AGENCY CAN EVALUATE WHETHER THE MANUFACTURER'S

PROPOSED STUDY OF THE DRUG IN HUMANS IS

APPROPRIATE?

A  CORRECT.  THE PROTOCOL BASED ON THE

INFORMATION THAT THE COMPANY GIVES THEM, YES.

Q  OKAY.  AND THE PROTOCOLS THAT ARE

SUBMITTED MUST CONTAIN THE METHOD FOR

DETERMINING THE DOSES TO BE ADMINISTERED, THE

PLANNED MAXIMUM DOSAGE, AND THE DURATION OF

INDIVIDUAL PATIENT EXPOSURE TO THE DRUG;

CORRECT?

A  YES.  AS PART OF THE PROTOCOL.

Q  OKAY.  THE PROTOCOLS MUST CONTAIN A

DESCRIPTION OF CLINICAL PROCEDURES, LABORATORY

TEST, OR OTHER MEASURES TO BE TAKEN TO MONITOR

THE EFFECT OF THE DRUG IN HUMAN SUBJECTS AND TO

MINIMIZE RISK?

A  CORRECT.  AND YOU'RE TALKING ABOUT

PHASE II, PHASE III.

Q  OKAY.  AND THE FDA WAS AWARE OF THE

PROTOCOLS BEING USED IN THE STUDIES CONDUCTED BY

NOVARTIS AT ALL PHASES OF STUDY OF AREDIA AND

ZOMETA; CORRECT?

EXHIBIT 2
31

C

EXHIBIT 2
32

(TAYLOR) Daubert Hearing (Taylor v NPC) (Vogel, Parisian) 4/19/2013 12:00:00 PM

Q. In this case, do you know that Mr. Taylor was paralyzed by bone damage before taking Aredia?

A. No, sir.

Q. Do you know, after taking Aredia, he was able to walk again?

A. No, I have not looked at the case records.

Q. You don't disagree with FDA approval of these products, right?

A. No, sir.

Q. To obtain approval, Novartis did clinical trials?

A. Yes, sir.

Q. Submitted protocols to the FDA that describe what would be done during those trials, correct?

A. Yes.

Q. And discussed those protocols with FDA?

A. Yes.

Q. FDA made recommendations to the protocols?

A. Recommendations, right. They didn't write the protocols.

Q. They did approve the protocols?

A. Eventually. There were modifications, but, yes, sir.

Q. And those protocols contained information about the number of doses, maximum dosage, and duration of therapy?

A. Based on what the company was wanting to get approved.

Q. FDA approved that approach that were used in the clinical trials as to dose and duration issues, correct?

**Novartis - Zometa / Aredia**                                                                                   **Page 95**

**EXHIBIT 2**
**33**

# D

EXHIBIT 2

34

asking you about what the FDA does as part of its clinical safety review.

A.  Yes.  And it takes into account the duration of the exposure.

Q.  Thank you, Doctor.

Can you identify any FDA clinical safety review for Aredia or Zometa that claim the doses and durations of exposure were not properly evaluated?

A.  No, sir.

Q.  Okay.  The review also evaluates multiple questions regarding the design and protocols of the clinical safety trials, correct?

MR. SHELQUIST:  Object to the form of the question.

THE WITNESS:  I can go back to the last answer.  I think if you went in terms of -- what was it you asked about the FDA?

BY MR. BROMBERG:

Q.  I'm not going back to my last question, Doctor.

MR. SHELQUIST:  She's got an opportunity to clarify.

MR. BROMBERG:  I -- I had another question pending.

THE WITNESS:  Oh, okay.

**EXHIBIT 2**
**35**

# E

EXHIBIT 2

36

of their deliberations?

A. Yes, sir.

Q. And ODAC was asked to answer questions based on these presentations in writing that were posed to them by the FDA itself. True?

A. Well, they created a record as to their vote. They don't vote in writing.

Q. Okay. ODAC answered several questions with respect to the evaluation for safety and efficacy of these clinical trials. Correct?

A. Correct.

Q. And one of the questions had to do with whether or not they would recommend the approval of Zometa for use in treating cancer patients who had bone metastasis from breast cancer. True?

A. The breast cancer indication, yes, sir.

Q. And the committee determined that there was substantial evidence from adequate and well-controlled investigations of Zometa efficacy in breast cancer and myeloma, and as to the safety of Zometa, on the basis of an 11-to-nothing vote, which was unanimous. True?

A. Yes, sir.

Q. Now, now following ODAC's recommendations, FDA concluded that, quote,

**Novartis - Zometa / Aredia**                                                    **Page 960**

**EXHIBIT 2**
**37**

(MENG TRIAL) DAY 04 (Parisian)  5/1/2013  4:21:00 PM

"adequate information has been presented to demonstrate that the drug product is safe and effective for use as recommended in the agreed upon labeling," quote.  True?

A.    Yes, for the 4-milligram dose, yes.

Q.    Thank you.

ODAC, the members of ODAC and certainly FDA, knew that bisphosphonates had been studied and developed since the 1970s.  Right?

A.    Well, there was discussion that had gone back much further than the 1970s.

Q.    Well, they knew that bisphosphonates had been studied in a scientific way and clinically for about 40 years, which might have taken the development period back into the 1960s, actually.  Isn't that right?

A.    Correct.  They went back to the very first approval, yes, sir, which was either didronate or Didronel.

Q.    And ODAC and FDA knew that there had been a number of bisphosphonates, other than Aredia and Zometa, that had been around and used clinically in the United States and in other countries for decades.  Isn't that right?

A.    Yes, sir.

Novartis - Zometa / Aredia                                    Page  961

**EXHIBIT 2**
**38**

# Exhibit 3

EXHIBIT 3

39

A

EXHIBIT 3
40

(GEORGES TRIAL) Day 05 (Sung, Marx)  4/16/2013  8:35:00 AM

Q It says, does it not, "Clinically BPs" and that's

bisphosphonates, isn't it, sir?

A Yes.

Q "BPs advanced therapy for malignant diseases such as multiple myeloma and breast and prostate cancer by decreasing life threatening skeletal related complications including hypercalcemia of malignancy, pathologic fractures, spinal cord compression, and severe bone pain."

Did I read that correctly?

A Yes, you did.

Q And you wrote that in 2011, did you not, sir?

A Yes.

Q And that's a true statement today, is it not?

A I believe so.

Q And in fact, bisphosphonates have advanced the therapy, the treatment, the medical control of breast cancer that has metastasized to the bone; isn't that correct?

A Yes.

Q And it has decreased the number of life threatening skeletal related complications, correct?

A Correct.

Q And it's your understanding that by reducing pathologic fractures these medications have reduced the morbidity which is the illness that goes along with those fractures, correct?

A Correct.

**EXHIBIT 3**

**41**

(GEORGES TRIAL) Day 05 (Sung, Marx) 4/16/2013 8:35:00 AM

Q Well, based on your research you also as you note in this section of your article -- no, leave it up please -- you also note that bisphosphonates have made significant advances in reducing severe bone pain, correct?

A Yes.

Q And you have reviewed the scientific literature with respect to that and in fact several of those articles in the scientific literature are cited after that proposition, correct?

A Yes.

Q Now you also state with respect to bisphosphonates, do you not -- may I have the next one please -- on that same page that long-term studies suggest that potent bisphosphonates such as ZA and "ZA" is an abbreviation for zoledronic acid which is Zometa, correct?

A Correct.

Q You note there that long-term studies suggest that potent bisphosphonates such as Zometa decrease the tumor burden in animals, correct?

A Correct.

Q That means that animals who receive Zometa have the amount and volume of their cancer tumors shrink or reduce, correct?

A I'm not sure if it makes it shrink or disappear. I think that's what you said but I think it controls the disease. They've looked into that extensively because they're not sure

EXHIBIT 3

42

(GEORGES TRIAL) Day 05 (Sung, Marx)  4/16/2013  8:35:00 AM

patient groups?  Isn't that what you said in your article, sir?

A   Right.  The term is "suggest."  So do I know for sure?

No.  It suggests that and when we say "suggest" it just means

that we typically need to do further studies on that.

So the answer is still "suggest."  Do I know for

sure?  I can't say.  You know, I suggest.  Certain things it

worked, so.

Q   And it has suggested that in patient groups such as

patients who have breast cancer, like Ms. Georges, that it does

improve the quality of life and improve the survival, correct?

A   Correct.

Q   Thank you.  Now, sir, Aredia and Zometa, as far as you are

aware, still today are -- well, primarily Zometa as you

indicated, is one of the primary medicines being used for the

treatment of metastasized cancer to bone, correct?

A   Correct.

Q   And that means that this is a -- what's referred to as a

standard of care drug?  It's a first choice or a first line

drug, correct?

A   I believe so.

Q   And you're aware that when cancer metastasizes to the bone

it can destroy the bone tissue.  It can cause as you mentioned

hypercalcemia.  Do you recall referring to that?

A   Correct.

Q   And hypercalcemia is when cancer gets into the bone,

Page 62

**EXHIBIT 3**

43

(GEORGES TRIAL) Day 05 (Sung, Marx)  4/16/2013  8:35:00 AM

starts to eat into the bone, and then calcium from the bone which is what bones are made of, goes into the circulatory system, correct?

A   Correct.

Q   And when that happens hypercalcemia is a very serious side effect of the dissolution of the skeleton by the cancer and it can be fatal in some instances, can it not?

A   Correct.

Q   And Aredia and Zometa both treat that very, very successfully, do they not?

A   Yes, they do.

Q   And also it's correct that from your knowledge, your reading and your writing, that the use of Aredia and Zometa have significantly reduced skeletal-related events or fractures, pathologic fractures, in patients who have breast cancer metastasized to the bone, correct?

A   Correct.

Q   And they have significantly -- significantly reduced the pain that goes along with metastasis to the bone, correct?

A   Correct.

Q   And, in fact, bone metastasis from breast cancer or from prostate cancer or other solid tumor cancers, when it gets into the bone, from your reading and your knowledge of the literature, can be extremely, extremely painful, can it not?

A   Yes.

Page  63

**EXHIBIT 3**
**44**

quarterback or the captain of the ship when it comes to the

relationship that you have with oncologists in treating

patients that you have in common, correct?

A   Correct.  I purely serve as a consultant.

Q   Right.  And you're not qualified to treat the patient's

metastasis to the bone for, if no other reason, you're not a

doctor, right?

A   Correct, not a physician, oncologist to be specific.

Q   Right.  And the question of how much Aredia or Zometa a

patient should receive is up to the cancer doctor, isn't that

correct?

A   Correct.

Q   And the question of how long a patient should receive

Zometa or Aredia is up to the cancer doctor, isn't that

correct?

A   Correct.

Q   And you would never tell a doctor to use a different

dosage or a different prescription of time -- well, strike that

question.

You, sir, do not have expertise in treating breast

cancer, correct?

A   Not in breast cancer.

Q   All right.  And you're not a bone expert, correct?

A   Not am a bone expert.

Q   Right.  You don't consider yourself to be an expert on

EXHIBIT 3
45

# B

EXHIBIT 3

46

Sung, Eric C., DDS (Rhodes & Mathews v NPC)  Vol. I  10/11/2011  9:10:00 AM

decision to administer Zometa to Mr. Rhodes?

A   No.

Q   Based upon your reading and understanding of the literature, IV bisphosphonates were the standard of care for prostate cancer patients with bone metastases like Mr. Rhodes at that time; right?

A   Correct.

Q   And pamidronate and Aredia and Zometa are to this day state of the art treatments for metastatic bone disease; right?

A   I believe so.

Q   You agree that at the time Mr. Rhodes received Zometa, there was no other medication or therapy that prevented skeletal-related events?

A   Correct.

Q   Now you are not offering any opinion that Zometa did not in fact protect Mr. Rhodes' bones, are you?

A   No.

Q   Do you have any reason to believe that the Zometa did not provide an indicated benefit -- its indicated benefit to Mr. Rhodes?

A   No.

Q   Are you aware that Mr. Rhodes presented with exposed bone on March 3, 2002?

**EXHIBIT 3**
47

# C

EXHIBIT 3

48

his last name -- Mehrotra, M-e-h-r-o-t-r-a -- I mean,

I think there are cancers that do not involve bone

and I don't think it would affect the 10 to

20 percent of patients.

Q. Is breast cancer a cancer that can involve

bone?

A. Yes.

Q. And in the case of Ms. Odia, her breast

cancer in fact did involve bone as it metastasized

the bone. Correct?

A. That is correct.

Q. And in the case of Ms. Odia, her metastatic

breast cancer resulted in a number of

skeletal-related events. Correct?

A. Correct.

Q. And elevated calcium is a potential fatal

complication of cancer metastatic to bone. Correct?

A. That is correct.

Q. And Zometa and pamidronate are approved for

the treatment of prevention of hypercalcemia

malignancy. Correct?

A. Yes.

Q. And are you aware that, in addition to

preventing skeletal-related events such as pathologic

fractures, elevated calcium, the need for radiation

**EXHIBIT 3**
**49**

Sung, Eric C., DDS (Odia v NPC)  8/7/2013  12:00:00 PM

to bone and spinal cord compression, Zometa and

pamidronate have also been demonstrated to have a

direct antitumor effect?

A. I believe they have antitumor and I believe

it's also antiangiogenesis.

Q. And are you aware that Zometa has been

proven to have a life extension benefit?

MS. WEBER: Object to form.

THE WITNESS: Yes.

BY MR. DHINDSA:

Q. And Zometa or pamidronate were the standard

of care therapies for cancer metastatic to bone

during the time period when Ms. Odia was treated with

these medications.

Correct?

A. I believe so.

Q. And do you have any understanding as to the

relative potency of Zometa or pamidronate?

A. Compared to what?

Q. Compared to each other?

A. Zometa is stronger than -- or more potent

than Aredia.

Q. Are you aware that cancer patients who

experience one fracture are at greater risk of

subsequent fractures?

Page 150

**EXHIBIT 3**
**50**

D

EXHIBIT 3

51

I think you've testified today that bisphosphonates are advanced therapy for malignant diseases such as multiple myeloma and breast and prostate cancer. They decrease life-threatening skeletal-related complications, which is what you write here. So I assume that you still agree with that?

A   Yes.

Q   You also have a sentence here that says that long-term studies suggest that potent BPs such as zoledronic acid decrease tumor burden in animals. What does that mean?

A   There's some belief -- there's other effects of the Zometa that inhibits tumor growth, and that could be the anti-angiogenesis or affects the ability of the tumor to grow in bone.

Q   Are there studies also that show that zoledronic acid prevents the metastases of the cancer?

A   I believe there are some information about that.

Q   Not just the skeletal-related events associated with metastases, but actually preventing the progression of cancer from one site in the body to another site in the body. Correct?

A   Correct. It prevents the tumor to go into bone.

Page 312

EXHIBIT 3
52

Q  You say there's also studies that suggest that there's improved quality of life and survival in certain patient populations.  So you're referring there to data in humans showing a survival advantage from use of Zometa.  Correct?

A  Correct.

Q  Has that survival advantage been demonstrated in various types of cancers -- breast cancer, myeloma, other populations, to your knowledge?

A  To my knowledge, specifically, breast cancer and multiple myeloma patients.

Q  Not seen any studies on lung cancer?

A  I'm seeing the use of it on lung cancer more and more.  So I would say the answer is yes.  I haven't read any papers on it recently.

Q  Looking at page 1877 in the right-hand column, you're discussing the hypotheses that attempt to explain the specificity of bisphosphonate-related ONJ, and you state that the specific parameters that contribute to the jaws having an increased sensitivity to bisphosphonates have not been identified.

Do you still agree with that statement as published here?

A  Correct.

Q  There's a lot of hypotheses that have been put

**EXHIBIT 3**
**53**

# E

EXHIBIT 3

54

Sung, Eric C., DDS (Georges v NPC)  4/20/2011  12:00:00 PM

therapy would be very, very high. I do discuss that very openly with my patients.

Q  Have you ever suggested to one of your patients to cease taking Aredia or Zometa?

A  Never.

Q  You would defer to an oncologist for those decisions?

A  I would discuss it with the oncologist in regards to what is going on. There are certain literature that Aredia or Zometa maxes out its effects during certain periods of time.

Given such, I have discussed with oncologists, and I'm stating if they have been on it for seven years or six years -- I'm making up the numbers right now; I want to make that very clear -- and the patient has oral lesions, perhaps there may be a benefit-risk ratio to the point where the risk of the ONJ or BRONJ being so significant -- maybe there's a break that would be beneficial to the patient.

Q  What do you believe the risk of ONJ is in patients taking Aredia or Zometa therapy?

A  With Aredia, very high. With Zometa, in dental therapy I would say, in my mind, it would be almost a certainty.

Q  So you're telling the ladies and gentlemen of

Page 75

**EXHIBIT 3**
**55**

F

EXHIBIT 3
56

procedures. Agree?

A    That is correct.

Q    I'm just reviewing your report.

So you also haven't offered an opinion in this case that an alternative dosing regimen for bisphosphonates, if Ms. Liebling had received fewer infusions than she -- than she got of bisphosphonates, that that would have prevented her ONJ. Agree?

A    Agree.

Q    And, in fact, you haven't offered an opinion as to any differences in medical or dental treatments other than perhaps not receiving any bisphosphonates at all that would have prevented Ms. Liebling's ONJ. Agree?

MS. GIRARDI: Object to form.

THE WITNESS: Agree.

BY MR. SULLIVAN:

Q    Now, Ms. Liebling had two problems -- two big medical problems in her life. One was cancer. She was a patient diagnosed with cancer. You agree she had cancer?

A    Yes.

Q    Okay. And she also had a condition called fibromyalgia. Agree?

A    Yes.

Page 38

**EXHIBIT 3**
**57**

# Exhibit
# 4

EXHIBIT 4
58

A

EXHIBIT 4
59

(DOPSON_TROUTT TRIAL) Day 07 (Ruth Troutt; Vogel) 4/1/2014 8:30:00 AM

A. IT WAS USED INITIALLY FOR HYPERCALCEMIA.

Q. TELL THE JURY WHAT HYPERCALCEMIA IS?

A. HYPERCALCEMIA IS AN ENTITY WHERE A PATIENT HAS AN ACCESS AMOUNT OF CALCIUM WHICH CAN CAUSE CARDIAC AND RENAL PROBLEMS, AMONG OTHER THINGS. AND THIS DRUG WAS USED PRIMARILY TO LOWER THE CALCIUM LEVELS.

Q. ALL RIGHT. AND HOW MUCH DID YOU USE FOR THAT, AS FAR AS DOSAGE?

A. IT WAS USED QUITE BIT. IT'S USED, YOU KNOW, EPISODICALLY. A PATIENT WOULD HAVE HYPERCALCEMIA AND GET AN INFUSION OF PAMIDRONATE, AND THEN FOLLOW -- IF THE SOURCE INCREASED CALCIUM COULD BE TREATED MEDICALLY, SOMETIMES THAT WAS SUFFICIENT. IF NOT, SOMETIMES THE PATIENT GOT REPEATED INFUSIONS OF PAMIDRONATE FOR HYPERCALCEMIA TREATMENT.

Q. ALL RIGHT. DID THERE COME A TIME WHEN YOU BEGAN USING AREDIA FOR ANOTHER INDICATION?

A. YES, SIR.

Q. WHAT WAS THAT INDICATION?

A. THAT WAS AN INDICATION TO DECREASE THE INCIDENCE OF SKELETAL RELATED EVENTS THAT WERE THE CONSEQUENCE OF BONE METASTASIS FROM CARCINOMA OF THE BREAST.

Q. WHAT ARE SKELETAL RELATED EVENTS?

A. SKELETAL RELATED EVENTS CAN BE A RIB METASTASIS, METASTASIS TO THE SPINE, SOME ENTITY WHERE A METASTASIS WILL WEAKEN THE BONE.

Page 73

**EXHIBIT 4**

(DOPSON_TROUTT TRIAL) Day 07 (Ruth Troutt; Vogel)  4/1/2014  8:30:00 AM

Q. WHAT IS AREDIA -- THE SPECIAL EFFECT YOU WERE PRESCRIBING AREDIA FOR IN THOSE CIRCUMSTANCES?

A. TO REDUCE THE INCIDENCE OF SKELETAL RELATED EVENTS, ACCORDING TO PUBLICIZED MATERIAL.

Q. DID THERE COME A TIME WHEN YOU BEGAN PRESCRIBING ANOTHER BISPHOSPHONATE?

A. IV.

Q. IV BISPHOSPHONATES, YES?

A. YES, YES.

Q. WHAT WAS THAT?

A. THAT WAS A DRUG CALLED ZOLEDRONIC-ACID.

Q. DOES IT HAVE A COMMERCIAL NAME?

A. YES.

Q. WHAT IS THAT?

A. IT'S CALLED ZOMETA.

Q. ALL RIGHT. WHAT DID YOU USE THAT TO TREAT?

A. WE USE IT FOR HYPERCALCEMIA ALSO, INITIALLY, AND USED IT FOR TREATMENT OF SKELETAL RELATED EVENTS TO REDUCE THE INCIDENTS OF SKELETAL RELATED EVENTS.

Q. ALL RIGHT. ARE EITHER AREDIA OR ZOMETA CHEMOTHERAPY?

A. NO.

Q. CAN YOU DESCRIBE TO THE JURY WHAT THEY ARE IN RELATIONSHIP TO CHEMOTHERAPY?

A. THEY ARE DRUGS THAT AFFECT BONE METABOLISM, AND IN SO AFFECTING BONE METABOLISM, CAN REDUCE HYPERCALCEMIA, AS WE

Page 74

EXHIBIT 4
61

(DOPSON_TROUTT TRIAL) Day 07 (Ruth Troutt; Vogel)  4/1/2014  8:30:00 AM

A.  I GET $5,000 ALL DAY, TRIP INCLUDED.

Q.  AND YOUR TRAVEL AND EXPENSES?

A.  ARE INCLUDED.

Q.  THEY ARE COVERED?

A.  YES.

Q.  HOW MANY HOURS DID YOU SPEND READING OVER THE DOCUMENTS THAT YOU TALKED ABOUT WHEN -- IN PREPARATION FOR YOUR EXPERT REPORT?

A.  TODAY, I MEAN, FOR NOW?

Q.  YOUR EXPERT REPORT, HOW MANY HOURS DID YOU SPEND DOING THAT?

A.  THE EXPERT REPORT WAS QUITE DETAILED.  I GUESS, GEE WHIZ, 30, 40 HOURS PROBABLY TO PREPARE THIS REPORT.

Q.  YOU CHARGED FOR IT?

A.  YES, I DID.

Q.  AND YOU MET WITH MR. VECCHIONE OR SOME OTHER LAWYERS FROM THE PLAINTIFF'S SIDE TO PREPARE FOR YOUR TESTIMONY TODAY?

A.  YES.

Q.  CHARGED FOR THAT?

A.  YES, I DID.

Q.  WHEN MRS. TROUTT GOT ZOMETA IN 2002 TO 2005, IT WAS THE STANDARD OF CARE FOR PATIENTS WITH BREAST CANCER THAT HAD SPREAD TO THEIR BONES, CORRECT?

A.  CORRECT.

Page  99

EXHIBIT 4
62

(DOPSON_TROUTT TRIAL) Day 07 (Ruth Troutt; Vogel) 4/1/2014 8:30:00 AM

Q. AND IN GENERAL, YOU GIVE ZOMETA, AS A MATTER OF COURSE, OVER AREDIA, FOR YOUR PATIENTS?

A. I DISCUSS IT WITH THE PATIENTS AND USUALLY THEY PREFER TO BECAUSE OF THE SHORT TIME APPLICATION, THAT'S CORRECT.

Q. NOW, IT'S NOT JUST THE TIME APPLICATION. IT'S THE EFFICACY TOO, CORRECT?

A. NO, EFFICACY IS FAIRLY THE SAME. THERE'S A SLIGHT ADVANTAGE IN BREAST CANCER WITH ZOMETA OVER PAMIDRONATE, WHICH I THINK HAS FLATTENED OUT, BUT THAT WAS THE INITIAL, YOU KNOW, PRESENTATION.

Q. IF YOU THOUGHT THAT THE AREDIA WAS EQUALLY EFFECTIVE AS ZOMETA, WOULD YOU PRESCRIBE AREDIA?

A. I WOULD. IF IT WAS EQUALLY EFFECTIVE AND THE PATIENT AGREED, IN TERMS OF THE SHORT -- LONGER COURSE.

Q. IF IT WAS EQUALLY EFFECTIVE, YOU WOULD PRESCRIBE AREDIA RATHER THAN ZOMETA?

A. SAY AGAIN.

Q. YES, SURE. IF YOU THOUGHT AREDIA WAS EQUALLY EFFECTIVE AS ZOMETA, YOU WOULD PRESCRIBE AREDIA AS A MATTER OF COURSE, AND NOT ZOMETA, AS YOU JUST SAID YOU DID, CORRECT?

A. IF IT WAS EQUALLY EFFECTIVE, IT WOULD BE A CHOICE OF ONE OR THE OTHER.

Q. IF IT WAS EQUALLY EFFECTIVE, WOULD YOU PICK AREDIA?

A. I WOULD DISCUSS IT WITH THE PATIENT AND DECIDE IN TERMS OF WHAT WAS THE MOST APPROPRIATE MEDICATION.

EXHIBIT 4
63

Q.  IN YOUR PATIENTS WITH BREAST CANCER THAT HAS SPREAD TO
THEIR BONES YOU PRESCRIBE ZOMETA ALMOST EXCLUSIVELY?

A.  YES, I DO.

Q.  AND YOU JUST TOLD THE JURY ZOMETA IS MORE EFFECTIVE AT
PREVENTING BONE DAMAGE FROM THE BREAST CANCER THAN AREDIA IS,
CORRECT?

A.  VERY SLIGHTLY.  VERY SLIGHTLY IN A SELECTED POP -- VERY
SLIGHTLY IN THE SELECTED POPULATION.  FOR THE MOST PART IT'S
EQUALLY EFFECTIVE.

Q.  SIR, WHEN YOU ARE TREATING YOUR PATIENTS --

A.  YES.

Q.  WHEN YOU ARE TREATING YOUR BREAST CANCER PATIENTS WHOSE
CANCER HAS SPREAD TO THEIR BONES, YOU GIVE ZOMETA AS
4 MILLIGRAMS EVERY FOUR WEEKS, LIKE THE PRESCRIBING
INFORMATION SAYS, RIGHT?

A.  THAT'S CORRECT.

Q.  YOU DON'T GIVE A DIFFERENT DOSE?

A.  I DO NOT.

Q.  AND WHEN YOU ARE TRYING TO PROTECT THE BONES IN YOUR
BREAST CANCER PATIENTS WHOSE CANCER HAS SPREAD TO THEIR
BONES, YOU KEEP GIVING ZOMETA EVERY MONTH, CORRECT?

A.  YES.

Q.  YOU DON'T START GIVING IT LESS OFTEN THAN ONCE A MONTH
AFTER A WHILE, RIGHT?

A.  I HAVE BEEN LATELY.

Page 101

EXHIBIT 4
64

(DOPSON_TROUTT TRIAL) Day 07 (Ruth Troutt; Vogel)  4/1/2014  8:30:00 AM

Q.  HOW LATELY?

A.  A FEW YEARS.

Q.  YOU'VE TESTIFIED QUITE RECENTLY THAT IT'S ONLY IN YOUR
MULTIPLE MYELOMA PATIENTS THAT YOU SPREAD OUT DOSING OR
CHANGE DOSING, CORRECT?

A.  THAT'S TRUE, BUT IN THE LAST COUPLE OF YEARS I'VE BEEN
DOING IT WITH MY BREAST CANCER PATIENTS ALSO.

Q.  SO THAT'S A NEW THING, NEW PRACTICE OF YOURS IN THE LAST
COUPLE OF YEARS?

A.  IT'S A NEW PRACTICE AWAITING DOCUMENTATION.

Q.  THERE IS NO DOCUMENTATION YET?

A.  NOT YET.

Q.  YOU ARE A MEMBER, SIR, OF ASCO, AMERICAN SOCIETY OF
CLINICAL ONCOLOGY.  IT'S THE FIRST MEMBERSHIP YOU SAID,
DURING YOUR QUALIFICATIONS, CORRECT?

A.  YES.

Q.  AND YOU TALKED DURING YOUR DIRECT EXAMINATION ABOUT THE
MULTIPLE MYELOMA GUIDELINES.  I DON'T THINK YOU SAID YOU WERE
TALKING ABOUT THE MULTIPLE MYELOMA GUIDELINES, I BELIEVE YOU
WERE TALKING ABOUT THE ZOMETA AND THE DATA ABOUT MULTIPLE
MYELOMA AND (INAUDIBLE) THAT'S INTERESTING, CORRECT?

A.  THAT'S CORRECT.

Q.  NOW, ASCO, THE AMERICAN SOCIETY OF CLINICAL ONCOLOGY,
SIR, PUTS OUT GUIDELINES FOR CANCER DOCTORS ALL THROUGH THE
UNITED STATES, AND ALL THROUGHOUT THE WORLD, TO USE IN

Page  102

**EXHIBIT 4**
**65**

TREATING THEIR PATIENTS, RIGHT?

AND FOR EXAMPLE, THERE ARE MULTIPLE MYELOMA GUIDELINES THAT TALK ABOUT ALL SORTS OF DIFFERENT THINGS THAT DOCTORS MIGHT WANT TO CONSIDER WHEN TREATING THEIR MULTIPLE MYELOMA PATIENTS, RIGHT?

A. THAT'S CORRECT.

Q. AND BREAST CANCER TREATMENT AS WELL?

A. THAT'S CORRECT.

Q. SEPARATE AND DISTINCTIVE TO MULTIPLE MYELOMA GUIDELINES?

A. THAT'S CORRECT.

Q. THESE ARE CREATED BY EXPERTS IN THE FIELD FOR THE BENEFIT OF CANCER DOCTORS, NOT JUST MEMBERS OF ASCO BUT ANY CANCER DOCTORS?

A. YES, THEY ARE GUIDELINES. THEY DON'T TELL YOU EXACTLY WHAT TO DO. THEY SUGGEST THINGS. THEY ARE GUIDELINES.

Q. WELL, THE ASCO GUIDELINES ON BREAST CANCER, CONTRARY TO THE MULTIPLE MYELOMA GUIDELINES, TELL DOCTORS TO KEEP PATIENTS ON MONTHLY ZOMETA UNTIL THEY ARE BASICALLY TOO SICK TO BE GETTING ANY TREATMENT AT ALL EXCEPT DRUGS TO KEEP THEM COMFORTABLE AS THEY DIE, CORRECT?

A. THAT HAS BEEN STATED BY --

Q. THAT'S IN THE 2011 GUIDELINE.

A. THAT'S IN THE 2011 GUIDELINES THAT GO BACK TO 2003. THERE'S A MODIFICATION FROM 2003 TO 2011. BUT IN THE BOTTOM OF THOSE GUIDELINES THERE'S A STATEMENT THAT SAYS THAT THE

Page 103

EXHIBIT 4
66

**(DOPSON_TROUTT TRIAL) Day 07 (Ruth Troutt; Vogel) 4/1/2014 8:30:00 AM**

==CONTROL TRIAL ONLY SHOWS THAT ONE YEAR OF EFFICACY FOR BREAST CANCER AND ZOMETA. AT THE BOTTOM OF THOSE GUIDELINES.==

Q.  DOCTOR.

A.  YES.

Q.  I THINK YOU WENT A LITTLE BEYOND MY QUESTION.  MY QUESTION IS THE GUIDELINES, THE 2011 BREAST CANCER GUIDELINES.

A.  YES.

Q.  THE RECOMMENDATION THAT THEY REACHED, AFTER REVIEWING THE EVIDENCE, WAS TO ALL CANCER DOCTORS, KEEP GIVING ZOMETA. DON'T STOP IT UNTIL YOUR PATIENT'S HEALTH DECLINES SO MUCH UNTIL YOU'RE PRETTY MUCH DISCONTINUING ALL DRUGS ANYWAY, CORRECT?

A.  AS I READ IT, THEY SAY YOU SHOULD CLINICALLY EVALUATE THE PATIENT, BUT, IN ESSENCE, YOU ARE CORRECT.

Q.  THE WORDS ARE, "CONTINUE DOSING 4 MILLIGRAMS EVERY THREE TO FOUR WEEKS UNTIL EVIDENCE OF PATIENTS DECLINE IN THE GENERAL PERFORMANCE STATUS PERIOD."  CORRECT?

A.  CORRECT.

Q.  AND SUBSTANTIAL DECLINE TO THE PATIENT'S GENERAL PERFORMANCE STATUS, WHEN WE'RE TALKING ABOUT CANCER PATIENTS, WHAT I SAID THEY ARE DYING, THEY ARE SO SICK YOU ARE TAKING THEM OFF OF MEDICATION GENERALLY?

A.  OR MAYBE A COMORBID CONDITION OF RENAL DISEASE, SOMETHING LIKE THAT.

Page 104

**EXHIBIT 4**
**67**

Q. SOMETHING ELSE TO THE --

MADAM REPORTER: I CAN'T TAKE DOWN --

THE COURT: YOU ALL ARE TALKING OVER EACH OTHER AND SHE CAN'T GET THIS.

THE WITNESS: SORRY.

BY MR. GRIFFIS:

Q. DOCTOR, THE SUBSTANTIAL DECLINE, LET'S JUST GET THAT CLEAR, IT COULD BE -- MEAN A SUBSTANTIAL DECLINE BECAUSE OF THEIR CANCER, BECAUSE OF DIABETES, OR SOME OTHER CONDITION THAT THEY HAVE, THEY ARE REALLY, REALLY SICK AND YOU'RE TAKING THEM OFF ALL OTHER DRUGS?

A. AGREED.

Q. NOW, YOU MENTIONED DOSE RESPONSE, CORRECT --

A. YES.

Q. -- IN YOUR DIRECT EXAMINATION. AND YOU SAID THAT YOU BELIEVED THAT THERE IS A DOSE RESPONSE WITH REGARD TO THE ZOMETA AND HOW MUCH IS GIVEN TO PATIENTS?

A. YES.

Q. AND THIS IDEA OF DOSE RESPONSE WASN'T ESTABLISHED, IN YOUR OPINION, UNTIL 2007, OR 2008, CORRECT?

A. I DON'T KNOW. I THOUGHT IT WAS ESTABLISHED IN MY REPORT, WHICH WAS -- SO IT MUST BE --

Q. TAKE A LOOK AT YOUR EXPERT --

A. NO, IT'S THERE. 2009 IS WHEN I DID MY REPORT. I AGREE TO THAT.

EXHIBIT 4
68

A.  I HAVE.

Q.  AND YOU PRESCRIBE ZOMETA FOR YOUR PATIENTS BECAUSE YOU WANT TO GIVE THEM THE BEST CHANCE OF ESCAPING THOSE SORTS OF THINGS, RIGHT?

A.  BALANCED AGAINST A RISK VERSUS BENEFIT DISCUSSION WITH THE PATIENT, YES.

Q.  THANK YOU, SIR.

        THE WITNESS:  THANK YOU.  YOU'RE WELCOME.

        THE COURT:  MR. VECCHIONE.

        MR. VECCHIONE:  THANK YOU, YOUR HONOR.

                REDIRECT EXAMINATION

BY MR. VECCHIONE:

Q.  DR. VOGEL, YOU WERE ASKED SOME QUESTIONS ABOUT WHETHER ZOMETA IS THE STANDARD OF CARE.  CAN YOU SAY WHETHER OR NOT THE STANDARD OF CARE INCLUDES THE VARIOUS WARNINGS AND INFORMATION THAT YOU TELL A PATIENT THAT YOU'VE ALREADY DESCRIBED TO THE JURY?

A.  THAT'S ALL INCLUDED IN STANDARD OF CARE.

Q.  AND NOW, YOU ALSO MENTIONED, AFTER THIS DISCUSSION ABOUT PATIENT CHOICE, FOR YOU OR FOR ANY ONCOLOGIST WHOSE CHOICE IT IS AFTER YOU INFORMED THEM OF THE RISKS AND BENEFITS ON WHETHER TO TAKE A DRUG?

A.  IT'S ALWAYS A PATIENT'S CHOICE, BUT GOING INTO THAT EQUATION IS AN APPROPRIATE AMOUNT OF INFORMATION THAT HAS TO BE SUPPLIED TO THE PATIENT.

Page 125

**EXHIBIT 4**
**69**

# B

EXHIBIT 4
70

(BRODIE TRIAL) - Day 04 - Vogel and Boyd Vol 4  1/26/2012  7:19:00 AM

A. Who?

Q. Dr. Schubert?

A. No, I don't.

Q. You said in your expert report that you filed in this case, Doctor, that bisphosphonate medications have benefited huge numbers of people since they were introduced several decades ago, is that correct?

A. I agree with that.

Q. You believe that and agree with that?

A. I do.

Q. Zometa reduces skeletal morbidity, reduces pathological fractures, and does that with patients with advanced prostate cancer like Mr. Brodie, is that right?

A. Yes.

Q. And Zometa is the first and only bisphosphonate that's been shown to do that in patients with prostate cancer, is that right?

A. Pamidronate is not approved for prostate, that's correct.

Q. So the statement is true that Zometa is the only bisphosphonate?

A. That is true.

Q. And as for Zometa, you would prescribe Zometa to your patients with prostate cancer that has been metastasized to the bone and to other kinds of cancer patients as well, is that right?

EXHIBIT 4
71

Q. And sir, when that happens, the patient can develop paralysis, lose bowel control and control of other symptoms and functions of their body, and experience severe pain, is that right?

A. That's why we treat as quickly as possible to try to minimize that from happening, yes, sir.

Q. So you try to prevent it with drugs like Zometa?

A. We try to prevent it, that's correct.

Q. And of course, a patient's life could be shortened by a skeletal-related even like that, is that correct?

A. No question about that.

Q. Even if it doesn't break a bone, or before it breaks a bone, cancer that has metastasized from a site like the prostate to the bone can cause a lot of pain, is that right?

A. It can, yes, sir.

Q. It hurts a lot?

A. Yes.

Q. Patients may need radiation treatment to the bone because of the pain, is that right?

A. Can, yes.  Sometimes we use radiation therapy, that's correct.

Q. And of course, a radiation treatment for pain to the bone counts as a skeletal-related event, too, is that right?

A. It does.

Q. That's another thing that you hope to avoid when you

EXHIBIT 4
72

prescribe Zometa?

A. Indeed.

Q. You hope to avoid having to irradiate patients' bones to treat their pain?

A. We hope to prevent -- or not prevent, we hope to reduce the incidence of skeletal-related events, whether they require radiation therapy or any other type of palliative therapy.

Q. Zometa works for that?

A. Right.

Q. You cited an article by a Dr. Corso in your expert report, is that correct?

A. Yes.

MR. GRIFFIS: May I approach, Your Honor?

THE COURT: You may.

Q. (By Mr. Griffis) I've handed you, sir, a different article by the same doctor you cited in your expert report, Dr. Corso, and the title is, tell me if I'm correct, "Zoledronic Acid," which is Zometa, "exerts its anti-tumor effect in multiple myeloma interfering with the bone marrow microenvironment." Is that correct?

A. That's what it says.

MR. GRIFFIS: I move the admission of the Corso study under 803.18, Your Honor.

MR. OSBORN: We would object on the grounds of relevance. The article relates to multiple myeloma.

EXHIBIT 4
73

C

EXHIBIT 4

74

JAMES M. VOGEL, M.D.

Q.   Same question with regard to extractions, Doctor.  I mean, can you state that even if extractions don't occur, that no ONJ will occur?

MR. BLACK:  Objection.

A.   No, I can't, and we have evidence in my patient here where there was no extraction and she developed ONJ.

Q.   Now, what is your opinion, Doctor, regarding alternate or reduced dosing regimens?

A.   My opinion is that the evidence in terms of the reports that I read indicate that reduced dosing can reduce the chance of ONJ with no reduction in skeletal-related events.

Q.   Is that something that you have instituted in your practice?

A.   It's something that we are starting to institute in our practice.

Q.   When did that occur?

A.   After I did the research to present my expert report.

Q.   Tell me precisely what you are basing that decision on, Doctor?

A.   Let me get into my -- 58, please, in

Page 276

**EXHIBIT 4**
**75**

JAMES M. VOGEL, M.D.

my report.

Q. Corso article?

A. Yes, sir.

Q. Is that the only -- is that the only basis?

MR. BLACK: Objection.

A. That's my basis.

Q. Is this another case report, Doctor?

MR. BLACK: Objection.

A. It's actually more of a controlled study.

Q. In what regard?

A. Well, they had patients in group A and patients in group B and they are comparing patients in group A and group B and they are applying a certain schedule in group A and another schedule in group B.

Q. Is there a control group without -- who are not receiving bisphosphonates?

A. No.

Q. So can you -- so it lacks a control group?

MR. BLACK: Objection.

A. It lacks a control group, yes, sir,

Page 277

**EXHIBIT 4**
**76**

JAMES M. VOGEL, M.D.

Q. And that's approximate?

A. Yes.

Q. That's clearly not your clinical experience, correct?

A. My clinical experience could not be, on the basis of the small amount of patients I treat, to develop, you know, a composite figure.

Q. Well, in fact, you have testified that you treated hundreds of patients with intravenous bisphosphonates and yet only two have developed ONJ, correct?

A. Yes.

Q. What are you relying on to establish that 5 percent figure?

A. I think it's data from various studies that I quoted.

Q. Are any of those studies controlled randomized controlled trials?

MR. BLACK: Objection.

A. I don't think so.

Q. Do they report controlled data?

A. I don't know. I don't think so.

Q. Now, with regard to the Corso article, I just have a few questions.

EXHIBIT 4

77

# D

EXHIBIT 4

78

JAMES M. VOGEL

Q.  So you're not aware of any studies that indicate that treatment with Denosumab completely stopped all osteoclastic activity?

A.  I know Denosumab affects osteoclastic activity and diminishes osteoclastic activity.  I don't know the magnitude and I don't know how it works.

Q.  Now, in the two abstracts we just looked at, which were substantial randomized control trials, you agree that the results showed a 1 to 2 percent rate of ONJ in patients with metastatic cancer treated with Denosumab?

A.  That's what it said.

Q.  And likewise the results showed a 1 to 2 percent rate of ONJ in patients with metastatic cancer treated with Zometa; correct?

A.  Yes, sir.

Q.  Would you agree with me that these studies established that the rate of ONJ in persons treated with Zometa is approximately 1 percent?

Page 301

EXHIBIT 4
79

Vogel, James M. (In Re: Aredia & Zometa Lit)  1/7/2010  8:50:00 AM

JAMES M. VOGEL

MR. VALAD:  Object to the form; asked and answered earlier.

A.  In these studies that's what it said.

Q.  And that's lower than the 5 percent you offer in your expert report; correct?

A.  Yes, sir.

Q.  Do you think the randomized control double-blind double dummy studies are more reliable than the cohort studies and case reports you rely on for your 5 percent in establishing the incidence of osteonecrosis in the jaw in Zometa users?

MR. VALAD:  Objection to the form.  Objection to incomplete question.

A.  I think you have to analyze the clinical material.  And the question is what would the pre-dental examinations on these patients, how was the clinical material analyzed with respect to dental, known dental problems that could precipitate osteonecrosis of the jaw.  So

Page  302

**EXHIBIT 4**
**80**

Vogel, James M. (In Re: Aredia & Zometa Lit) 1/7/2010 8:50:00 AM

JAMES M. VOGEL

I don't think you can necessarily draw a conclusion from one particular study to the other without in-depth analysis of the clinical population.

Q. You agree that you did not in formulating your opinion that osteonecrosis of the jaw occurs in 5 percent or more of patients treated with Aredia or Zometa, take into account these substantial randomized control trials involving thousands of patients treated with Zometa; correct?

A. I think we very carefully analyzed the material that was presented to us and in my judgment offered a very conservative figure.

Q. Okay, that's not the question I asked, doctor. I'm going to move to strike that answer.

The only question is in formulating your opinion back in 2008, you did not take into account the results of these two large randomized control trials involving patients treated with

Page 303

EXHIBIT 4
81

Vogel, James M. (In Re: Aredia & Zometa Lit)  1/7/2010  8:50:00 AM

JAMES M. VOGEL

Zometa over numerous months in formulating your opinions regarding the incidence rate of Zometa and Aredia and ONJ?

MR. VALAD:  Objection to the form; timeline.

A.  That's correct.

Q.  And that's partly because they didn't exist at the time you wrote your report; correct?

A.  That is correct.

Q.  And you have not supplemented your opinions in this case to evaluate or take into account these abstracts that report an approximately 1 percent incidence rate of ONJ in patients treated with Zometa; correct?

A.  That is correct.

MR. JOHNSTON:  Let's take a break for a few minutes.

THE VIDEOGRAPHER:  Going off the record, the time is 3:32 p.m.

(A recess was taken.)

THE VIDEOGRAPHER:  Back on the

Page 304

EXHIBIT 4
82

E

EXHIBIT 4

83

(TAYLOR) Daubert Hearing (Taylor v NPC) (Vogel, Parisian)  4/19/2013  12:00:00 PM

you?

A. I wasn't asked.

Q. Let's talk about Corso for a second.  Do you have that?

A. Let me look at that.

Q. Number 26 on the exhibit list, but I don't think they followed that exhibit list.

MR. MALINOWSKI:  May I approach, your Honor?

THE COURT:  Yes.

THE WITNESS:  What number, sir?

BY MR. MALINOWSKI:

Q. Number 26.

You have Corso in front of you?

A. I do.

Q. And that is the article you just referred to, right?

A. Yes.

Q. Published in 2007, correct?

A. Corso was published in -- It was published in 2007, yes.

Q. That is two years after Mr. Taylor stopped taking Zometa, true?

A. I don't know anything about Mr. Taylor.  You keep saying that.

Q. The findings in Corso have never been replicated in any other study in the six years it has been published, have they?

A. I don't know that.

Q. Corso is a retrospective drug review, correct?

Page  38

**EXHIBIT 4**
**84**

(TAYLOR) Daubert Hearing (Taylor v NPC) (Vogel, Parisian)  4/19/2013  12:00:00 PM

A. Let me look.

Q. Look at page 1545.

Actually, first page, are you on the the first page?

A. Yes.

Q. "Patients and methods" lower right hand corner.

A. Yes.

Q. "Retrospective single center study," do you see that?

A. Yes.

Q. That means the authors went back and examined medical charts of patients previously treated?

A. Yes.

Q. Not a randomized controlled trial?

A. No, it is not.

Q. Not a controlled trial at all, is it?

A. It is controlled against itself, yes.

Q. Sir, do you recall in your 2009 deposition giving the following testimony, and this is at page 277 and 278.

Referring to the Corso study, "So it lacks a control group?

A. It lacks a control group, yes, sir, but it is not designed for a controlled group.

Q. But it still lacks one?"

Do you remember that?

A. Yes.

Q. So it is not a controlled study?

Page 39

**EXHIBIT 4**
**85**

(TAYLOR) Daubert Hearing (Taylor v NPC) (Vogel, Parisian)  4/19/2013  12:00:00 PM

A.  It is and isn't.

Q.  It does not have a control group, does it?

A.  Control meaning you wouldn't treat the patient at all.  It is impossible to do that.

Q.  And this study--

Looking at the treatment schedule and SRE's, on the second page, you see that, sir?

A.  I see the second page.

Q.  And you see lower right-hand corner, treatment schedule, and SRE?

A.  Yes.

Q.  Says, third line, "SRE is skeletal related event," right?

A.  You are on the treatment schedule?

Q.  SRE means skeletal related event?

A.  Yes.

Q.  That is the reason bisphosphonates are prescribed, to prevent skeletal related events?

A.  One of the reasons.

Q.  Third line:  "11 SRE's were observed in the standard group" --

A.  Yes.

Q.  A couple lines down, "17 in the reduced scheduled group."  You see that?

A.  Yes.

Q.  "11 SRE's observed in the scheduled group after 26 point 6

Page  40

**EXHIBIT 4**
**86**

(TAYLOR) Daubert Hearing (Taylor v NPC) (Vogel, Parisian)  4/19/2013  12:00:00 PM

months, and 17 in the reduced group after 25 point 5 months,"

do you see that?

A. Yes.

Q. That means the standard dosing schedule developed about 5 point 3 SRE's a month, right?

A. No. But, you see, you don't know what the denominator is.

You are telling me depends on how many patients you are following to achieve that particular percentage.

Q. Sir, it says -- the information is in the article, 28 SRE's were observed over a total of 2,027 persons?

A. Yes.

Q. SRE per 100 years and gives numbers and breaks it down SRE by month for standard scheduled group and reduced dosing frequency group, correct?

A. Yes.

Q. And, in a standard dosing schedule, 11 skeletal events were reported over a time period of, time period 26 point 6 months?

A. Yes.

Q. That breaks down to 5 SRE's per schedule?

A. I didn't do the math.

Q. 11 divided by 20 point 6 is about 5.3, does that sound right?

And then reports 17 SRE's reported during a median study time of 12 point 5 months in a reduced scheduled group.

A. That is what it says.

Page 41

**EXHIBIT 4**

87

(TAYLOR) Daubert Hearing (Taylor v NPC) (Vogel, Parisian)  4/19/2013  12:00:00 PM

Q. And that breaks down to reduce frequency dosing schedule about 1 point 36 SRE's a month, correct?

A. I haven't done the math. I just accept it in the interest of time.

Q. The difference between 1 point 36 in reduced frequency and 5.3 in a standard schedule means the standard had about 2.56 per month less than a reduced dosing schedule, true?

A. The way you put it. I have to study it to make sure we are talking about the same thing.

I see where you are going, basically.

Q. 2.5 times the number of SRE's per month isn't exactly the same efficacy, is it?

A. Doesn't appear to be but that is not where we were going with the study.

Q. Sir --

MR. MALINOWSKI: May I approach, your Honor?

THE COURT: Yes.

BY MR. MALINOWSKI:

Q. Back in the other binder now, sir.

Can you flip to number 14.

A. Yes.

Q. And that is a study by Hatoum, H-a-t-o-u-m, correct?

A. Yes.

Q. Are you familiar with that study?

A. I am.

Page 42

**EXHIBIT 4**
88

(TAYLOR) Daubert Hearing (Taylor v NPC) (Vogel, Parisian)  4/19/2013  12:00:00 PM

Q. And the title is "Zoledronic Acid and Skeletal Complications in Patients with Solid Tumors and Bone Metastases."

A. Correct.

Q. If you look at the abstract, at the Results section, you see that, first page?

A. The abstract section?

Q. Abstract, first page, Results.

A. Yes.

Q. Five lines up from the bottom it says -- There is a sentence that says:  "The rate of skeletal complications with ZA use --" zoledronic acid --

A. Yes.

Q. " --use on the reommended schedule was point 16 events per month versus point 31 events per month for nonrecommended schedules and point 43 events per month for no treatment."

Do you see that sentence?

A. I do.

Q. This is another study reporting twice as many SRE's per month in a reduced dosing schedule compared to the standard FDA approved four milligrams every three to four months schedule?

A. Hang on, I am looking for something.

Q. Can you answer the question based on the study?

A. Just a minute.  I am almost there, just a minute.  Okay.

Now, ask your question again because I have some

Page  43

**EXHIBIT 4**
**89**

(TAYLOR) Daubert Hearing (Taylor v NPC) (Vogel, Parisian)  4/19/2013  12:00:00 PM

information I want to share with you.

Go ahead.

Q. The Hatoum study was published in 2008, right?

A. Published in 2008.

Q. One year after the Corso study you like, right?

A. One year after.

Q. After the Corso study?

A. Yes.

Q. And Hatoum, likewise, shows about two times the risk of skeletal related events per month when a patient is put on a reduced dosing schedule compared to the standard four milligrams a month three to four times a week schedule, correct?

A. Yes.

THE COURT: Mr. Malinowski, doesn't this go to the weight as opposed to the admissibility?

Why shouldn't he be permitted to rely upon the studies?

MR. MALINOWSKI: It is based on the unreliability of the methodology. He picked one study that he didn't provide to the Court.

He showed one study which shows the risk of osteonecrosis if you are on a four milligram schedule compared to a reduced schedule but risk is not the only part of the equation. He, as an oncologist, has to take into account the

Page  44

EXHIBIT 4
90

benefits, as well.

This shows reduced dosing frequency is not as effective as the standard FDA approved dosing frequency. This goes to the reliability of his opinions.

I don't think they just speak to the weight.

THE COURT:  But the reliability of an opinion is subject to cross-examination.  And the fact that he may choose one study over another, is that really a methodology issue?

MR. MALINOWSKI:  Your Honor, what the methodology issue is, his methodology, in the real world treating patients, he gives Zometa.  He gives Zometa treating multimyeloma almost exclusively.  He comes into court and says you should not give the patients Zometa, you should give them Aredia, even though he thinks they are not as safe as being treated with Zometa.

That is not what he does in the real world.

THE COURT:  That sounds like to me fertile ground for cross-examination.

MR. MALINOWSKI:  I think, your Honor, in Daubert, reliability aspect of the expert's opinion is specifically what is at play in a Daubert analysis.

THE COURT:  Yes, yes, that term is used, and I agree with you.

MR. MALINOWSKI:  I think in Daubert's progeny, GE versus Joiner says you have to look at methodology and sufficiency of the facts that he relied on.

EXHIBIT 4
91

(TAYLOR) Daubert Hearing (Taylor v NPC) (Vogel, Parisian)  4/19/2013  12:00:00 PM

The facts he is relying on is the Corso study.  That is the only study he indicated shows any increase risk of osteonecrosis of the jaw if you stay on a standard schedule as opposed to reduced frequency and these undermine the Corso study and there are more studies I can get into that shows -- that actually looked at Corso and rejected it, rejected the premise of Corso.

If your Honor will permit me, I will go into one more study that shows experts, an impartial expert panel, looked at Corso and said this is insufficient.  This doesn't prove, if you go on a reduced frequency schedule, it will be just as effective reducing osteonecrosis of the jaw, which is the whole point of why these are prescribed in the first place.

That is what the trial is going to be about.

Dr. Vogel will not come in and testify that Mr. Taylor should have received reduced frequency.  There is not a witness that will testify to that.

To allow him to talk about the Corso study and reducing frequency schedules will confuse the jury.  No one is going to connect it up to Mr. Taylor's case and it is unreliable.

The one study he relies on post dates --

THE COURT:  So you are essentially saying Dr. Vogel's testimony would not assist the trier of fact?

MR. MALINOWSKI:  Wouldn't assist the trier of fact and

Page  46

**EXHIBIT 4**
**92**